# EXHIBIT 1

Kelly M. Dermody (State Bar No. 171716)
kdermody@lchb.com
Celena Heredia Nelson (State Bar No. 356840)
chnelson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

*Attorneys for Amici Curiae Journalists, Media
Organizations, Researchers, and Professors*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID K. HAUSMAN,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Case No. 4:26-cv-03730-AMO<br><br>**BRIEF OF AMICI CURIAE JOURNALISTS, MEDIA ORGANIZATIONS, RESEARCHERS, AND PROFESSORS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:  June 18, 2026<br>Time:  2:00pm<br>Courtroom:  10<br>Judge:  Hon. Araceli Martínez-Olguín<br>Action Filed:  April 29, 2026 |

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE ...................................................................................................... 1

I.      INTRODUCTION ............................................................................................................... 2

II.     ARGUMENT ....................................................................................................................... 2

        A.      Amici are dedicated to informing the public about the U.S. government's
                immigration enforcement actions. ........................................................................... 2

        B.      ICE's unlawful failure to respond to FOIA requests hinders access to this
                important information, undermining the mission of Amici to inform the
                public and causing irreparable harm. ....................................................................... 5

III.    CONCLUSION .................................................................................................................... 7

APPENDIX A ................................................................................................................................ 10

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*,
    470 F. Supp. 3d 32 (D.D.C. 2020) ........................................................................... 6

*Cox Broad. Corp. v. Cohn*,
    420 U.S. 469 (1975) ............................................................................................... 3

*Ctr. for Pub. Integrity v. United States Dep't of Def.*,
    411 F. Supp. 3d 5 (D.D.C. 2019) ........................................................................... 3

*Garro Pinchi v. Noem*,
    813 F. Supp. 3d 973 (N.D. Cal. 2025) ................................................................... 4

*N.Y. Times Co. v. ICE*
    (No. 1:25-cv-04356 S.D.N.Y) ............................................................................... 21

*Payne Enters., Inc. v. United States*,
    837 F.2d 486 (D.C. Cir. 1988) ............................................................................... 6

*Richmond Newspapers, Inc. et al. v. Commonwealth of Virginia*,
    448 U.S. 555 (1980) ............................................................................................... 3

**Statutes**

5 U.S.C. § 552(a)(2)(D) ............................................................................................... 5

## **INTEREST OF AMICI CURIAE**

Amici curiae are the following 25 media organizations, think tanks, professors, individual journalists, and researchers from around the country: The Acacia Center for Justice, Yulia Almazova (Freelance Journalist), Asad L. Asad (Assistant Professor at Stanford), CBS Broadcasting Inc., Wayne A. Cornelius (Professor at U.C. San Diego), Logan M. Davis (The Colorado Times Recorder), Diana Dominguez (Investigative Reporter), Dow Jones & Company d/b/a The Wall Street Journal, Chloe N. East (Associate Professor of Economics at University of Colorado Boulder), Andrew Free (Freelance Journalist), Human Rights Watch, Jennifer A. Jones (Associate Professor at Northwestern), David Leblang (Professor at University of Virginia), The Marshall Project, Mission Local, NC Local, The New York Times Company, Joseph Nwadiuko (Assistant Professor at University of Pennsylvania), Annette Dekker (Assistant Professor at U.C. Los Angeles), Paul Ong (Professor at U.C. Los Angeles), Nancy Plankey-Videla (Associate Professor Texas A&M), Yael Schacher (Director for the Americas and Europe, Refugees International), Jayashri Srikantiah (Professor at Stanford Law School), Stop AAPI Hate, and Tara Watson (Director and Senior Fellow at the Brookings Institution). These institutions and individuals have all used and benefited from the Immigrations and Customs Enforcement ("ICE") enforcement activity data published by the Deportation Data Project ("DDP"). The interest statements of Amici are set forth in Appendix A and incorporated herein.[1]

---

[1] Amici nongovernmental corporations have filed disclosure statements under Federal Rule of Civil Procedure 7.1. They are attached as Exhibit 2. This brief is authored by *pro bono* counsel from the law firm Lieff Cabraser Heimann & Bernstein, LLP. No party contributed to the drafting or funding of this brief.

## I.    INTRODUCTION

Immigration enforcement actions conducted by the United States Immigration and Customs Enforcement ("ICE") have immediate local and national impacts impacting a broad range of interests, including public health and safety, labor availability, educational access, criminal justice, and community and social service needs, among others. Amici are 25 journalists, researchers, and professors with a keen interest in the types of immigration enforcement data sought by Plaintiff David Hausman and the Deportation Data Project ("DDP") in this case. The immigration data DDP has requested is used extensively by Amici whose work serves the public interest in understanding the United States government's immigration enforcement operations and their myriad impacts. Delays in access to this data impede Amici's work serving this important purpose. Accordingly, Amici respectfully support the preliminary injunction sought by Plaintiff to access the requested data under the Freedom of Information Act ("FOIA"), 5 USC § 552.

## II.    ARGUMENT

Amici are dedicated to providing the public with robust research, investigation, and reporting regarding the U.S. immigration system and the government's enforcement actions. ICE's failure to produce this basic information in a timely fashion undermines Amici's ability to inform the public. It is critical that ICE be ordered to timely produce data on an ongoing basis. If Plaintiff is not granted an injunction, Amici and others may be forced to submit their own duplicative FOIA requests and, most likely, to file overlapping and redundant lawsuits. This would burden the court system, cost unnecessary agency resources, and impede the public from being timely informed of the actions of their government. In addition, if Amici are impeded in their important reporting and research roles, there is a tremendous risk that the American public will be ill-equipped to make well informed and timely decisions as social services providers, business leaders, community members, and voters. A preliminary injunction, allowing Amici and the public to access this data on an ongoing basis, will prevent this irreparable harm.

### A.    Amici are dedicated to informing the public about the U.S. government's immigration enforcement actions.

Amici are committed to providing truthful and comprehensive information to the public

BRIEF OF AMICI CURIAE ISO MOT. FOR PRELIM. INJUNCTION
CASE NO. 4:26-CV-03730-AMO

regarding the U.S. government's immigration enforcement activity. Amici represent a broad spectrum of perspectives but all agree that access to this data is crucial.

Amici's work serves a vital democratic function. In a functioning democracy, an informed electorate always inures to the public benefit. *See Ctr. for Pub. Integrity v. United States Dep't of Def.,* 411 F. Supp. 3d 5, 15 (D.D.C. 2019). Importantly, it is often through journalists that the public receives important information about current events. Journalists act as "surrogates for the public." *Richmond Newspapers, Inc. et al. v. Commonwealth of Virginia*, 448 U.S. 555, 573 (1980); *see also Cox Broad. Corp. v. Cohn,* 420 U.S. 469, 490-91 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."). Further, journalists help explain information and provide valuable context to the public, and, typically, have increased visibility and access. "While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report what people in attendance have seen and heard." *Richmond Newspapers,* 448 U.S. at 573.

The Spreadsheets at issue in this litigation have been the source of virtually all data on ICE activities since January 2025, forming the quantitative backbone of public understanding of how the U.S. government is carrying out immigration enforcement and how current practices compare to past administrations. Complaint ("Compl.") ¶ 2; Motion for Preliminary Injunction ("Mot."). at 2. The data contained in these records, specifically the anonymized, individual-level records of ICE encounters, detainer requests, arrests, detentions, and removals, allow Amici and the public to trace enforcement outcomes as individuals move through the immigration system, from arrest to potential deportation. Compl. ¶ 30; Mot. at 3–4.

Amici's journalism, research, and scholarship rely on timely access to this data. Since 2025, over 2,000 news reports have used the Spreadsheets to inform the public about current patterns in ICE arrests, detentions, and deportations, and to compare those patterns to enforcement under past administrations. Compl. ¶ 9; Mot. at 1. These reports have appeared in a variety of outlets, from The New York Times, Wall Street Journal, Los Angeles Times, and CBS

News, to Bloomberg, The Telegraph, and local newspapers serving communities across the country. Compl. ¶ 21. *See also, supra,* Amici Statements of Interest. Members of Congress, state and local government agencies and officials, federal district courts, and advocacy organizations across the political spectrum have similarly used the data to understand the extent of ICE's enforcement actions. Mot. at 1, 5–6.  Proponents of the administration's enforcement policies have also relied on the data, including the White House itself, which issued a press release applauding the increase in ICE arrests and linking to news articles using the Spreadsheets. Compl. ¶ 24; Mot. at 5. Regardless of political perspective, access to credible information ensures that the public can make sound judgments about what is actually occurring at taxpayer expense.

Amici's work does more than merely chronicle enforcement activity; it also serves as an essential review of or check on government power. Using the data, journalists, including Amici, have been able to investigate whether or not administrations are acting consistently with public pronouncements (*e.g.,* whether the administration is targeting the so-called "worst of the worst" for enforcement),[2] where ICE may be operating and/or housing detainees, and the extent to which immigration detentions have involved children and, if so, for how long they have been held.[3] *See also, supra,* Amici Statements of Interest.

Courts have also relied on facts developed using the Spreadsheets, including this Court's decision staying ICE's policy of re-arresting and re-detaining noncitizens previously released from custody. Compl. ¶ 25; Mot. at 5 (*citing Garro Pinchi v. Noem,* 813 F. Supp. 3d 973, 996 n.8 (N.D. Cal. 2025)). Local governments have likewise used the data to identify whether ICE activity implicates local land use issues. Compl. ¶ 25; Mot. at 5. This is precisely the kind of government accountability that FOIA was enacted to facilitate, and Amici's diverse reporting and

---

[2] Albert Sun, *Most Immigrants Arrested in City Crackdowns Have No Criminal Record*, NEW YORK TIMES (Dec. 4, 2025), https://www.nytimes.com/interactive/2025/12/04/us/ice-arrests-criminal-recordsdata.html; Julia Ingram, *Most arrested in some big city immigration crackdowns had no criminal record, new data shows*, CBS NEWS (Dec. 3, 2025), https://www.cbsnews.com/news/immigration-crackdowns-mostly-non-criminals-chicago-dclosangeles-data/.

[3] Anna Flagg, *ICE Threw Thousands of Kids in Detention, Many For Longer Than Court-Prescribed Limit*, THE MARSHALL PROJECT (Dec. 17, 2025), https://www.themarshallproject.org/2025/12/17/children-immigration-detention-dilley-ice.

research is indispensable to realizing that purpose.

**B.  ICE's unlawful failure to respond to FOIA requests hinders access to this important information, undermining the mission of Amici to inform the public and causing irreparable harm.**

Professor Hausman and his colleagues at the Deportation Data Project have created a central repository for the Spreadsheets that is publicly accessible and free, available at deportationdata.org. Compl. ¶¶ 6, 19; Mot. at 2–3. This reduces the need for journalists and researchers to file piecemeal FOIA requests (*e.g.,* requests concerning a single city or detention center) and thereby reduces the overall burden on the ICE FOIA office. Compl. ¶ 6; Mot. at 2. However, because of ICE's repeated failures to comply with the mandates of FOIA, Amici and others have frequently filed their own FOIA requests seeking the Spreadsheets.[4] Ordering ICE to produce this data in response to DDP requests would greatly reduce administrative burden and further FOIA's goals.

In addition to ensuring ICE's compliance with the statute, Amici submit that the relief sought advances the policy objectives behind FOIA's command that frequently requested records should be made available proactively. Under 5 U.S.C. § 552(a)(2)(D), agencies are required to make available for public inspection and copying records that have been released in response to a FOIA request and that "the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records." Congress included this provision precisely because it recognized that when particular records are in high demand, the administrative burden of processing individual requests one by one is wasteful and contrary to the public interest. Rather than forcing dozens or hundreds of requesters to independently seek, wait for, and potentially litigate access to the same information, the statute contemplates that agencies will act proactively and make frequently sought records readily available.

Here, ICE's own conduct confirms that the Spreadsheets are exactly the type of records contemplated by this provision. At least 24 other requesters across the country submitted similar requests for these spreadsheets in 2025 alone. Compl. ¶ 32; Mot. at 7, 20. Numerous FOIA requesters have sued ICE under FOIA seeking subsets of the Spreadsheets. Compl. ¶¶ 33–34;

---

[4] *See, supra,* Statements of Interest referencing Amici's own FOIA requests.

Mot. at 19–20, fn.12. ICE itself has acknowledged the frequency of these requests by placing many of them on "administrative hold" due to pending litigation seeking similar data. Mot. at 7, 21 n.13. The sheer volume of requests and litigation over this data demonstrates that ICE's failure to make the Spreadsheets available proactively, or to even respond to requests within statutory deadlines, imposes unnecessary administrative burdens on the agency and the public.

ICE's delays directly undermine Amici's ability to inform the public. When the Deportation Data Project was unable to obtain updated versions of the Spreadsheets between October 2025 and March 2026, there were large information gaps about the agency's enforcement practices, including during large-scale enforcement operations in Illinois, Maine, Minnesota, and North Carolina. Compl. ¶¶ 8, 22, 28; Mot. at 9, 21–22. Several news organizations published stories about the lack of data available to assess patterns in ICE enforcement, and Plaintiff and his colleagues received dozens of inquiries from journalists, advocates, researchers, and members of the public asking when updated data would be available. Compl. ¶ 28; Mot. at 9.[5]

If Plaintiff is not granted a preliminary injunction, Amici and others who depend on this data will face an unfortunate choice: either go without the information necessary to inform the public, or submit their own individual FOIA requests and, most likely, file lawsuits. Even if it is an option, individual enforcement is unsatisfactory because such burdensome individual enforcement efforts would likely yield data that is stale by the time it is produced. Mot. at 21 (citing Wu Decl. ¶ 6). This result would only multiply burdens on the ICE FOIA office and the courts, while diverting Amici from their core mission.

The harm caused by ICE's delays is irreparable because it cannot be remedied after the fact. In an environment of rapidly changing immigration enforcement policy, "stale information is of little value." Compl. ¶ 27 (quoting *Payne Enters., Inc. v. United States,* 837 F.2d 486, 494 (D.C. Cir. 1988)); Mot. at 21. Where an obligation to disclose exists, a plaintiff and those it serves—and by extension, the public—may suffer irreparable harm if denied access to information that is highly relevant to an ongoing public debate. Mot. at 21 (citing *Am. Immigr.*

---

[5] *See also, supra, e.g.,* Statement of The Marshall Project referencing reporting and analysis regarding delays in ICE data reporting.

- 6 -

*Council v. U.S. Dep't of Homeland Sec.,* 470 F. Supp. 3d 32, 38 (D.D.C. 2020)). Past releases of the Spreadsheets have been used within days of their release to break front-page news about the federal government's enforcement practices and identify unannounced changes to enforcement policies. Compl. ¶ 5. When that data arrives months after, it comes too late for it to play a contemporaneous role in public planning, much less the public debate over whether those enforcement operations are advancing objectives shared by the public. Mot. at 22. Communities are then ill-equipped to make well-informed decisions for health and safety, and voters cannot adequately fulfill their roles as members of civil society. This is a harm that no subsequent disclosure can repair.

## III.    CONCLUSION

For the reasons stated above, Amici respectfully request that the Court grant Plaintiff's Motion for a Preliminary Injunction, thereby ensuring that Amici and all members of the public can access timely, ongoing data about ICE enforcement actions. The public interest in government transparency and accountability, embodied both in FOIA's statutory deadlines and in its requirement that frequently requested records be made proactively available, demands no less. An injunction will prevent the irreparable harm that flows from ICE's persistent delays, allowing Amici to continue their critical work of informing the public and enabling democratic accountability over one of the most consequential areas of federal government activity.

Dated:    May 20, 2026        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: _____
    Kelly M. Dermody

Kelly M. Dermody (State Bar No. 171716)
kdermody@lchb.com
Celena Heredia Nelson (State Bar No. 356840)
chnelson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

*Attorneys for Amici Curiae Journalists, Media Organizations, Researchers, and Professors*

BRIEF OF AMICI CURIAE ISO MOT. FOR PRELIM.
INJUNCTION
CASE NO. 4:26-CV-03730-AMO

**ATTESTATION OF FILER—LOCAL RULE 5-1(i)(3)**

I, Celena Heredia Nelson, attest that concurrence in the filing of this document has been obtained from the signatories shown above.  I declare under penalty of perjury that the foregoing is true and correct.

_____
Celena Heredia Nelson

3504665.1

BRIEF OF AMICI CURIAE ISO MOT. FOR PRELIM.
INJUNCTION
CASE NO. 4:26-CV-03730-AMO

## APPENDIX A

### *The Acacia Center for Justice, Washington, DC*

The Acacia Center for Justice ("Acacia") is a nonprofit, nongovernmental organization that supports and partners with a national network of legal service providers who provide legal defense to immigrants at risk of detention or deportation. It also leads the National Immigrant Legal Responders Alliance (NILRA), a coordinated legal effort to respond to immigration enforcement actions and expand immigrant legal defense programs for adults and children across the country. Acacia has a direct professional interest in the continued public availability of deportation and immigration enforcement data because such data is integral to its programmatic planning, its funding decisions, and its ability to understand and respond to patterns of immigration enforcement affecting the communities it serves.

Acacia has used publicly available enforcement data to inform its work in several ways. The data has been important for making decisions in selecting partner organizations for funding, including determining the definition of need for legal services for NILRA. Acacia has also used the data to conduct analyses mapping and tracking patterns and dynamics of ICE arrests, detentions, transfers, and removals. This includes analyses to understand how long individuals arrested in specific states remain in-state before being transferred to other states for detention and, often, removal. Acacia has tracked these patterns for specific demographic groups, including by age, gender, and national origin, to ensure its programs and resources are directed where the need is greatest.

The continued availability of this data is essential to Acacia's work. Without timely access to enforcement statistics, the organization cannot effectively allocate resources, identify emerging enforcement patterns requiring rapid legal response, or ensure that vulnerable populations have access to legal defense when and where they need it most. Acacia therefore has a substantial interest in the relief sought by Plaintiff.

### *Yulia Almazova, Freelance Journalist, New York, NY*

Yulia Almazova is a New York-based journalist, currently a student at the Craig Newmark Graduate School of Journalism at CUNY and a summer fellow at Wired. Her reporting

3504665.1

- 10 -

examines the intersection of technology, economic policy, and their human impact. She has a direct professional interest in the continued public availability of deportation and immigration enforcement data because such data is essential to her work documenting how federal policies and macroeconomic forces affect vulnerable communities.

Ms. Almazova has relied on publicly available data to track population demographic changes and identify stories about the effects of immigration enforcement on communities. Her reporting depends on access to reliable, structured data regarding enforcement, detention, and deportation to produce accurate, fact-based journalism. As an immigrant herself, Ms. Almazova recognizes that access to accurate immigration data is both a professional and civic necessity— without it, journalists cannot independently examine how enforcement policies are implemented or hold the government accountable for their consequences.

The continued availability of this data is essential to Ms. Almazova's work. Restricting public access to enforcement data undermines the ability of journalists and the public to assess the scope and impact of federal immigration policy. Ms. Almazova therefore has a substantial professional and public interest in the relief sought by the parties to this action.

### Asad L. Asad, Assistant Professor of Sociology, Stanford University

Asad L. Asad, Ph.D., is an Assistant Professor of Sociology at Stanford University. He has a direct professional interest in the public availability of deportation and immigration enforcement data because such data is essential to his academic research on the relationship between immigration enforcement and public health, psychological well-being, and social mobility among vulnerable noncitizen populations.

Dr. Asad has relied on publicly available enforcement data in two principal ways. First, he uses the data to contextualize findings from his existing research—focused on the period from 2011 to 2018—within the contemporary enforcement landscape. His work examines the relationship between deportation rates and psychological distress, adverse infant health outcomes, and involvement in mobility-enhancing institutions among vulnerable noncitizens. Access to current enforcement data allows Dr. Asad to assess whether the dynamics he has documented are continuing in muted, similar, or amplified form under present conditions. Second, Dr. Asad is

using the data to extend the timeline of his research into the current period, enabling him to systematically evaluate how changes in patterns of immigration enforcement relate to health and social outcomes across presidential administrations.

The continued availability of this data is essential to Dr. Asad's work. Without access to reliable, timely enforcement statistics, he cannot situate his prior findings within evolving policy conditions or produce the longitudinal analyses necessary to understand how shifts in enforcement practice affect communities over time. Dr. Asad therefore has a substantial professional and public interest in the relief sought by Plaintiff.

### *CBS Broadcasting Inc., New York, NY*

CBS News journalists cover immigration enforcement for a national audience. They have a direct professional interest in the continued public availability of deportation and immigration enforcement data because such data forms the empirical foundation of their reporting on federal immigration policy and its effects on communities across the United States.

Journalists for CBS News have relied on publicly available enforcement data to produce original investigative journalism serving the public interest. Using this data, they have reported that immigration crackdowns in Chicago, Washington, D.C., and Los Angeles have predominantly targeted individuals without criminal records, bringing quantitative analysis to bear on official claims about the focus of enforcement operations.[6] They have also analyzed ICE detention records to reveal that a significant share of detained noncitizens had no criminal convictions, let alone convictions for violent crimes.[7] The enforcement data has also allowed CBS News journalists to examine geographic patterns in ICE arrests across border and southern states[8], to investigate the impact of local sanctuary policies on federal arrest activity,[9] and to quantify

[6] Julia Ingram, *Immigration Crackdowns Mostly Target Non-Criminals in Chicago, D.C., Los Angeles, Data Shows*, CBS News, https://www.cbsnews.com/news/immigration-crackdowns-mostly-non-criminals-chicago-dc-los-angeles-data/.

[7] Julia Ingram, *ICE Detentions Target Non-Criminal Immigrants as Violent Crime Convictions Remain Small Share, Analysis Shows*, CBS News, https://www.cbsnews.com/news/ice-detentions-non-criminal-immigrants-violent-crime-convictions-analysis/.

[8] Jared Ochacher, Camilo Montoya-Galvez, Julia Ingram, *ICE Arrests in Border and Southern States*, CBS News, https://www.cbsnews.com/news/ice-arrests-border-and-southern-states/.

[9] Julia Ingram, *How Sanctuary Policies Impact ICE Arrests*, CBS News, https://www.cbsnews.com/video/how-sanctuary-policies-impact-ice-arrests/.

arrests of Somali immigrants as the administration claimed its Minnesota deportation operation would target them.[10] Each of these stories required access to granular, reliable data to move public discourse beyond anecdote and political assertion toward empirical fact.

The continued availability of this data is essential to CBS News' public interest journalism. Without it, neither their journalists nor other members of the press can independently verify government claims about the scope, targeting, and geographic distribution of immigration enforcement. CBS Broadcasting Inc. thus has a substantial professional and public interest in the relief sought by Plaintiff.

***Professor Wayne A. Cornelius, Director Emeritus, Center for Comparative Immigration Studies, University of California San Diego***

Professor Cornelius is an immigration policy specialist at U.C. San Diego with five decades of experience using data generated by relevant federal agencies. He maintains that he has never encountered a database as useful as the one created and maintained by the Deportation Data Project. The high degree of detail on immigrant arrests, deportations, and other key variables had made the data especially useful for his policy analysis. He relies on DDP data in his own research and writing, as well as to provide expert commentary to inform media reports and to advise graduate students on their research projects.

Professor Cornelius maintains that it is essential that the DDP database be updated in a timely way to maintain its usefulness for policy analysis. He believes the 20-day response timeline requested by Plaintiff to be consistent with the rapidly changing environment for U.S. immigration enforcement as both policy decisions and implementation practices are continually in flux and documenting the consequences of these changes requires timely productions of data.

***Logan M. Davis, Journalist, Consultant at Effect Communications, Columnist for the Colorado Times Recorder***

Logan M. Davis is a staff writer for the Colorado Times Recorder whose reporting has relied extensively on DDP data. The data has been instrumental to his investigative work in

---

[10] Camilo Montoya-Galvez, Joe Walsh, *ICE launches surge in Minnesota as Trump pushes for crackdown on Somali immigrants* https://www.cbsnews.com/news/ice-begins-surge-minnesota-trump-crackdown-somali-immigrants/.

- 13 -

several critical respects. Using the data, Mr. Davis identified nine temporary holding facilities in Colorado[11] and approximately 170 nationwide[12] where ICE appears to be in serial violation of its own guidelines limiting detention in agency "hold rooms" to seventy-two hours. The data revealed that hundreds of individuals in Colorado were held in excess of that limit, with at least two men each confined to a hold room for more than a month. The data has also served as an essential tool for monitoring compliance with Colorado law, which bars local law enforcement agencies from engaging in specific forms of cooperation with ICE. Arrest records obtained by the DDP have enabled Mr. Davis to identify agencies that are not complying with that prohibition. In addition, the data has proven vital in defending the accuracy of Mr. Davis's reporting against public denials by ICE itself.[13] On multiple occasions, the agency has attempted to refute his published findings but has been unable to account for contradictions within its own records.

Timely and ongoing production of the data is critical to the public interest Mr. Davis's reporting serves. Delays in the provision of data mean that his investigative work necessarily lags behind by months, with the practical consequence that violations of agency policy and state law go unreported and unaddressed until well after the fact. Continued access to current records is essential to ensure that the press can fulfill its role in informing the public and holding government agencies accountable in real time.

### *Diana Dominguez, Investigative Reporter*

Diana Dominguez (writing under the pen name Maria También) is an investigative journalist who publishes on immigration enforcement policy. She has a direct professional interest in the continued public availability of deportation and immigration enforcement data because such data is the essential research source underlying her investigative articles on

---

[11] Logan M. Davis, *Exclusive: Secret ICE Detention Facilities Exist Around Colorado, Data Shows*, Colo. Times Recorder (Mar. 2026), https://coloradotimesrecorder.com/2026/03/exclusive-secret-ice-detention-facilities-exist-around-colorado-data-shows/76983/.

[12] Logan M. Davis, *Exclusive: ICE Locks Thousands, Including Kids, in 170 Hold Rooms Nationwide—Here's Where They Are*, Colo. Times Recorder (Mar. 2026), https://coloradotimesrecorder.com/2026/03/exclusive-ice-locks-thousands-including-kids-in-170-hold-rooms-nationwide-heres-where-they-are/77352/.

[13] Logan M. Davis, *ICE Confirms CTR Reporting in Denial*, Colo. Times Recorder (Mar. 2026), https://coloradotimesrecorder.com/2026/03/davis-ice-confirms-ctr-reporting-in-denial/77248/.

immigration enforcement and its human consequences.

Ms. Dominguez has relied extensively on publicly available ICE and CBP enforcement data to produce original investigative reporting that would not otherwise have been possible. She used ICE arrest and detention datasets covering July 2025 to report on the controversial and deadly Glass House Farms ICE raids in California's Santa Barbara and Ventura Counties, obtaining actual enforcement numbers that contradicted official accounts.[14] She further used August 2025 detention and removal datasets to produce a post-raid analysis of those same enforcement operations.[15] Ms. Dominguez has also used ICE removal datasets to analyze demographic patterns in deportations, including an examination of ICE removals of women over seventy-five years of age in Fiscal Year 2025.[16]

The continued availability of this data is essential to Ms. Dominguez's work. Without public access to ICE and CBP apprehension and enforcement data, she cannot independently verify official claims about enforcement operations, trace the experiences of affected individuals and families through the detention system, or hold the government accountable for its enforcement practices. Ms. Dominguez therefore has a substantial professional and public interest in the relief sought by Plaintiff.

### ***Dow Jones & Company d/b/a The Wall Street Journal, New York, NY***

The Wall Street Journal (the "Journal"), a publication of Dow Jones & Company, Inc. is a news organization engaged in reporting and newsgathering on matters of public concern. The Journal has included publicly available ICE and CBP enforcement data in news articles that have provided detailed analysis of deportation tends of the past decade [17] and the Department of Homeland Security's efforts to recruit ICE Officers.[18] The Journal relies on the Freedom of

[14] Diana Dominguez, *In My Backyard*, https://open.substack.com/pub/mariatambien1/p/in-my-backyard.

[15] Diana Dominguez, *Not Knowingly*, https://open.substack.com/pub/mariatambien1/p/not-knowingly.

[16] Diana Dominguez, *She Was Not Alone: What ICE Data Reveals About Women over 75*, https://open.substack.com/pub/mariatambien1/p/she-was-not-alone-what-ice-data-reveals.

[17] The Wall Street Journal, *How Trump's Deportation Effort Is Playing Out, in Charts*, Sept. 25, 2025, https://www.wsj.com/us-news/ice-deportations-charts-b3593e29.

[18] The Wall Street Journal, *$50,000 Signing Bonus, No Age Caps: The Blitz to Hire ICE Officers*, Aug. 17, 2025, https://www.wsj.com/us-news/ice-recruitment-tactics-trump-d4bc32cf.

Information Act 5 U.S.C. § 552 ("FOIA" or the "Act") to gather information to report on the work of government and other matters of public interest and therefore has a strong interest in the outcome of this case. The continued availability of this data is essential to the Journal's work.

### *Chloe N. East, Ph.D., Associate Professor of Economics at the University of Colorado Boulder*

Chloe N. East, Ph.D., is an Associate Professor of Economics at the University of Colorado Boulder, a Non-Resident Fellow at The Hamilton Project at the Brookings Institution, and an affiliate of the National Bureau of Economic Research, the Institute for Research on Poverty, and IZA. She has a direct professional interest in the continued public availability of deportation and immigration enforcement data because such data is foundational to her academic and public-facing research on immigration enforcement and its effects on communities.

Dr. East has used publicly available enforcement data extensively in her recent scholarly and policy work. She has produced research published through the National Bureau of Economic Research analyzing immigration enforcement patterns and their consequences.[19] Dr. East has also used the data to produce policy-oriented analyses examining who ICE is arresting under current enforcement practices[20] and documenting ICE arrest activity in the New York City area.[21] This body of work spans both academic and public audiences and depends on access to granular, timely enforcement data to characterize the scale, geographic distribution, and demographic composition of immigration enforcement actions.

The continued availability of this data is essential to Dr. East's work. Without it, she cannot produce the empirical research necessary to inform policymakers, advocates, and the public about the realities of immigration enforcement or evaluate how enforcement practices

---

[19] Chloe N. East, National Bureau of Economic Research, Working Paper No. 35129, *Labor Market Impacts of ICE Activity in Trump 2.0*, https://www.nber.org/papers/w35129; Chloe N. East, National Bureau of Economic Research, Working Paper No. 34794, *ICE Arrests across Trump's First and Second Terms: Variation in Targeting, Method, and Geography,* https://www.nber.org/papers/w34794.

[20] Chloe N. East, *Who Is ICE Arresting?,* Immigration Research, https://immresearch.org/publications/who-is-ice-arresting/.

[21] Chloe N. East, *NYC Area ICE Arrests*, New York Immigration Coalition, https://www.nyic.org/wp-content/uploads/2025/12/NYC-Area-ICE-Arrests-v4-JV-12.8.25.pdf.

change over time. Dr. East therefore has a substantial professional and public interest in the relief sought by Plaintiff.

### *Andrew Free, Freelance Journalist, Atlanta, GA*

Andrew Free is a reporter who covers immigration enforcement, with a particular focus on deaths in ICE detention. He has a direct professional interest in the continued public availability of deportation and immigration enforcement data because such data is essential to his reporting on the treatment of individuals in federal immigration custody.

As part of his research on deaths in ICE detention, and in consulting engagements with families of deceased migrants and their legal teams, Free regularly consults records obtained and published by the Deportation Data Project. Using DDP data, Free has determined the number of individuals ICE recorded as released for the reason "Died," discovered multiple deaths never publicly announced by ICE, and identified other cases of poor record-keeping by ICE.[22] In several cases, Free has used DDP apprehension and detention data to show that decedents were hospitalized far more than ICE disclosed in its official death reports, or held in non-medical hold rooms far longer than federal standards allow. The data has also been invaluable in demonstrating that ICE's press releases about decedents' immigration and criminal histories were incomplete, false, or misleading.

Timely, public access to data about ICE detention is essential to informing the public, families, and decision-makers about the causes and effects of death in ICE custody, especially as federal officials consistently provide untimely, misleading, or false information about the detention system. Free therefore has a substantial professional and public interest in the relief sought by Plaintiff.

### *Human Rights Watch, New York, NY*

For over a decade, Human Rights Watch (HRW) has relied on DHS/ICE data released through FOIA to monitor and report on the US government's international human rights

---

[22] *See e.g.,* Andrew Free, *Private Prison Falsified Records in Detainee's Death in ICE Custody,* The Intercept, Feb. 26, 2026, https://theintercept.com/2026/02/26/ice-geo-group-moshannon-death-falsify/.

obligations as they relate to immigration enforcement practices.[23] HRW has collaborated with the plaintiff since 2017 by sharing FOIA requests and the data releases that each organization has received.

In recent years, ICE has delayed or outright rejected HRW's own FOIA requests. HRW now relies exclusively on the data received and provided by DDP, as it is identical to what HRW would otherwise request, avoiding duplication and reducing the burden on ICE's FOIA office.

The data received by DDP or HRW is required to report on the federal government's responsibilities related to immigration enforcement and international and domestic human rights law. HRW is currently using the DDP data in five separate research reports and intends on updating reporting with each subsequent data release. Regular and timely releases allow us to provide the public with the most accurate and current accounting of US immigration enforcement practices and obligations to human rights law.

### ***Jennifer A. Jones, Associate Professor of Sociology at Northwestern***

Jennifer Jones, Ph.D., is an Associate Professor of Sociology specializing in race and immigration. She has a direct professional interest in the continued public availability of deportation and immigration enforcement data because such data is essential to her teaching on immigration policy, her research on immigrant-serving organizations in the U.S. South, and her ability to provide students with accurate, up-to-date information on deportation trends and patterns.

Dr. Jones relies on information from the Deportation Data Project in multiple dimensions of her professional work. She uses the data in her teaching on immigration policy and recommends the Deportation Data Project as a resource for her students as they write papers, present on policy issues, and seek current data on deportation trends. Her own research examines how immigrant-serving organizations operate in the U.S. South, work that requires an accurate understanding of enforcement patterns, and she has published scholarship on the intersection of

[23] *See e.g.,* https://www.hrw.org/news/2025/11/04/us-ice-abuses-in-los-angeles-set-stage-for-other-cities; https://www.hrw.org/report/2017/12/05/deported/immigrants-uprooted-country-they-call-home; https://www.hrw.org/report/2015/06/16/a-price-too-high/us-families-torn-apart-by-deportations-for-drug-offenses; and https://www.hrw.org/report/2011/06/14/costly-move/far-and-frequent-transfers-impede-hearings-immigrant-detainees-united.

immigration policy and racial formation, including work on state-level immigration legislation[24] and the racialization of Latino immigrants in new destinations.[25] Timely data from the Department of Homeland Security is necessary for many aspects of her work and for accurate communication about immigration issues with the public.

The continued availability of this data is essential to Dr. Jones's work. Without it, she cannot provide her students with reliable information, ground her research in current enforcement realities, or contribute to informed public discourse on immigration policy. Dr. Jones therefore has a substantial professional and public interest in the relief sought by Plaintiff.

### ***David Leblang, Ambassador Henry Taylor Professor of Politics, University of Virginia***

David Leblang is the Ambassador Henry Taylor Professor of Politics at the University of Virginia, where he holds appointments in the Department of Politics, the Frank Batten School of Leadership and Public Policy, and the Miller Center of Public Affairs. His research focuses on the real-world impacts of immigration enforcement, both at the border and within communities, exploring how policies affect people's lives. To do this, he relies on credible, individual-level administrative data—like those compiled by the Deportation Data Project ("DDP"). The spreadsheets at the center of this case are the only public source of anonymized records that connect ICE encounters with what happens next: arrests, detentions, and removals, tracked across different places and over time.

Professor Leblang has relied on the DDP data—both ICE enforcement and CBP apprehensions data—across multiple ongoing research projects. His work on the consequences of state and local sanctuary policies uses monthly, county-level ICE activity to estimate how variation in cooperation between federal and local authorities affects arrests, crime reporting, and community public safety outcomes; his work on the political economy of border enforcement uses comparable records to study how visa policies and third-country agreements reshape the

---

[24] Jennifer Jones, *American Federalism and Racial Formation in Contemporary Immigration Policy: A Processual Analysis of Alabama's HB56*, Ethnic and Racial Studies (2017), https://www.tandfonline.com/doi/full/10.1080/01419870.2017.1403033.

[25] Jennifer Jones, *The Racialization of Latino Immigrants in New Destinations: Criminality, Ascription, and Countermobilization*, RSF: The Russell Sage Foundation Journal of the Social Sciences (2018), https://www.rsfjournal.org/content/4/5/118.short.

composition of who is encountered, detained, and removed at the southern border. The same data informs his teaching on U.S. immigration policy and his public writing on interior and border enforcement. Without the data, none of these analyses can be conducted with the granularity, timeliness, or geographic specificity that careful policy-relevant research requires.

Having continued, timely access to this data is critical—not just for Professor Leblang's research, but for the wider community of scholars who depend on it. Federal enforcement practices are now changing week by week, not year by year. If analysis lags behind, it cannot inform policymakers, courts, journalists, or the communities affected while those policies are still in effect. Without reliable access to these records, Professor Leblang and his collaborators can't thoroughly evaluate how federal immigration enforcement is working, check whether its outcomes match its intentions, or provide the kind of factual analysis that supports informed public debate.

### *The Marshall Project, New York, NY*

The Marshall Project is a nonpartisan, nonprofit news organization that covers the U.S. criminal justice and immigration enforcement systems. It has a direct professional interest in the continued public availability of deportation and immigration enforcement data because such data is the empirical foundation of its reporting on immigration detention, deportation, and the treatment of vulnerable populations in federal custody.

The Marshall Project has relied on DDP data to produce original investigative journalism over the past year. Its reporters used the data to reveal that more than 6,200 children were held in ICE detention,[26] to document children's deportation and detention more broadly,[27] and to report on conditions at particular ICE facilities.[28] [29] They used enforcement data to analyze ICE

---

[26] The Marshall Project, *ICE Kids Detention Over 6,200*, Apr. 6, 2026, https://www.themarshallproject.org/2026/04/06/ice-kids-detention-over-6200-trump.

[27] The Marshall Project, *ICE Children Deportation Detention*, Mar. 18, 2026, https://www.themarshallproject.org/2026/03/18/ice-children-deportation-detention-trump.

[28] The Marshall Project, *Immigration Detention Releases Family Dilley*, Mar. 2, 2026, https://www.themarshallproject.org/2026/03/02/immigration-detention-releases-family-dilley.

[29] The Marshall Project, *Children Immigration Detention Dilley ICE*, Dec. 17, 2025, https://www.themarshallproject.org/2025/12/17/children-immigration-detention-dilley-ice.

operations in Chicago—including an enforcement blitz and the elimination of judicial discretion[30] [31]—and to investigate the national expansion of immigration detention[32] and its impact on individual communities (*e.g.,* Springdale, Arkansas).[33] The organization has also reported on delays in releasing enforcement data and why such delays are particularly dangerous at this moment.[34]

The continued availability of this data is essential to The Marshall Project's work. Knowing who the government is holding is foundational to constitutional principles of transparency. With individuals dying in detention and the federal government's documented record of losing track of people in its custody—including children—timely public release of enforcement data is a matter of exceptional urgency. Without it, The Marshall Project cannot independently verify government claims, identify systemic failures, or inform the public about the exercise of extraordinary federal power over individuals and families. The Marshall Project therefore has a substantial professional and public interest in the relief sought by Plaintiff.

### *Mission Local, San Francisco, CA*

The DDP data has been a critical resource for San Francisco newspaper Mission Local. The paper has relied on the data for its coverage of ongoing Immigration and Customs Enforcement (ICE) activity in the San Francisco Bay Area. Reporters in the newsroom have repeatedly relied on the datasets obtained by the Deportation Data Project for individual encounters, arrests, detentions, and removals to understand local ICE enforcement and corroborate on-the-ground reporting. The data updates have been essential in understanding quantitative patterns in arrests and how those continue to change.

In one case, reporters used the datasets to trace the journeys of more than 2,000

[30] The Marshall Project, *ICE Chicago Immigration Blitz Data*, Dec. 18, 2025, https://www.themarshallproject.org/2025/12/18/ice-chicago-immigration-blitz-data.

[31] The Marshall Project, *Chicago ICE Trump Judicial Discretion*, Oct. 25, 2025, https://www.themarshallproject.org/2025/10/25/chicago-ice-trump-judicial-discretion.

[32] The Marshall Project, *Trump ICE Immigration Detention*, Aug. 1, 2025, https://www.themarshallproject.org/2025/08/01/trump-ice-immigration-detention.

[33] The Marshall Project, *Springdale Arkansas Immigration ICE Trump*, Jan. 28, 2026, https://www.themarshallproject.org/2026/01/28/springdale-arkansas-immigration-ice-trump.

[34] The Marshall Project, *Data ICE Chicago Shutdown Immigration*, Nov. 15, 2025, https://www.themarshallproject.org/2025/11/15/data-ice-chicago-shutdown-immigration.

immigrants through ICE custody, from their arrest to detention stays and, in many cases, through deportation.[35] Last summer, reporters also relied on the data to confirm reporting that asylum-seekers were being held longer and longer in detention at a short-term holding facility in downtown San Francisco, contrary to an ICE directive stipulating that immigrants could only be held in that holding room for 12 hours.[36] Another piece using the project's data helped the paper show how one-half of immigration arrests in and around San Francisco took place at check-ins, behind closed doors, giving a fuller understanding of the hundreds of arrests made in the city.[37] The data has also informed reporting on how an increasing number of people with no criminal background are being arrested in and around San Francisco.[38]

### *NC Local, Wilmington, NC*

NC Local is a statewide, nonprofit newsroom in North Carolina that provides free content for republication to other newsrooms across the state. It has a direct professional interest in the continued public availability of deportation and immigration enforcement data because, as a small-staff organization with limited capacity, such data fills a critical gap in its ability to cover federal immigration enforcement activity affecting North Carolinians.

NC Local has relied on publicly available enforcement data to produce multiple original stories over the past year, many of which have been among the most widely republished items across the state. Its reporters used the data to report that ICE arrested more than 3,300 people across North Carolina during the first nine months of the current administration,[39] to investigate where in the state ICE is seeking to expand its operations,[40] and to provide ongoing coverage of

---

[35] *Mission Local*, https://missionlocal.org/2025/07/ice-data-immigrants-arrested-sf/ (last visited May 10, 2026).

[36] *Mission Local*, https://missionlocal.org/2025/08/ice-long-detention/ (last visited May 10, 2026).

[37] *Mission Local*, https://missionlocal.org/2026/03/sf-ice-data-arrests-breakdown-check-ins/ (last visited May 10, 2026).

[38] *Mission Local*, https://missionlocal.org/2025/12/sf-ice-arrests-criminal-history/ (last visited May 10, 2026).

[39] NC Local, *ICE Arrested More Than 3,300 People Across NC During Trump's First 9 Months in Office*, Jan. 15, 2026, https://nclocal.org/2026/01/15/ice-arrested-more-than-3300-people-across-nc-during-trumps-first-9-months-in-office/.

[40] NC Local, *Where in North Carolina Is ICE Looking to Expand?*, Mar. 10, 2026, https://nclocal.org/2026/03/10/where-in-north-carolina-is-ice-looking-to-expand/.

BRIEF OF AMICI CURIAE ISO MOT. FOR PRELIM.
INJUNCTION
CASE NO. 4:26-CV-03730-AMO

immigration enforcement actions in North Carolina.[41] The timely release of enforcement data was especially important to NC Local's coverage of "Charlotte's Web," a major immigration enforcement action, enabling the newsroom to provide the public with information about the North Carolinians detained in that operation.[42] NC Local has pursued additional information about ICE actions in North Carolina through its own FOIA requests and, to date, has been unsuccessful in obtaining it,[43] making the data obtained through the DDP the only available source for this reporting.

The continued availability of this data is essential to NC Local's work. Without it, the newsroom—and the network of local outlets that republish its coverage—cannot provide North Carolinians with timely, fact-based reporting on federal immigration enforcement in their communities. NC Local therefore has a substantial professional and public interest in the relief sought by Plaintiff.

### *The New York Times Company, New York, NY*

The New York Times Company ("The Times") publishes *The New York Times* newspaper and nytimes.com. The Times has a direct interest in the continued public availability of deportation and immigration enforcement data.

The Times has used the DDP data to inform its reporting on ICE activity.[44] It has also pursued similar data itself through FOIA. *See N.Y. Times Co. v. ICE* (No. 1:25-cv-04356 S.D.N.Y). In this pursuit, it has encountered two interlocking challenges. First, ICE is particularly unresponsive to FOIA requests, often ignoring or summarily denying requests until a lawsuit is filed. Second, even when a lawsuit is filed, responsive records typically include only previous

---

[41] NC Local, *ICE Data Arrests NC*, Apr. 17, 2026, https://nclocal.org/2026/04/17/ice-data-arrests-nc/.

[42] NC Local, *Charlotte's Web Arrest Data*, Apr. 7, 2026, https://nclocal.org/2026/04/07/charlottes-web-arrest-data/.

[43] NC Local, *FOIA Efforts*, https://nclocal.bluelena.io/index.php?action=social&chash=f7e6c85504ce6e82442c770f7c8606f0.154&s=670160e4d7ac5b63794bbcaf8a368c4c.

[44] *See, e.g.*, Ana Ley & Albert Sun, *Trump's Immigration Crackdown Pervades Long Island Suburbs*, N.Y. Times (Apr. 22, 2026), https://www.nytimes.com/2026/04/22/nyregion/ice-arrests-long-island.html; Albert Sun, *Most Immigrants Arrested in City Crackdowns Have No Criminal Record*, N.Y. Times (Dec. 4, 2025), https://www.nytimes.com/interactive/2025/12/04/us/ice-arrests-criminal-records-data.html.

3504665.1

BRIEF OF AMICI CURIAE ISO MOT. FOR PRELIM. INJUNCTION
CASE NO. 4:26-CV-03730-AMO

iterations of agency data. The result is that both The Times (along with other requesters) and the agency must expend their own resources—and judicial resources—for up-to-date data to reach the public.

### Dr. Joseph Nwadiuko, MD, PhD, Assistant Professor of Medicine at the University of Pennsylvania and Annette Dekker, MD, MS, Assistant Professor of Emergency Medicine at the University of California, Los Angeles

Joseph Nwadiuko, MD, PhD, is an Assistant Professor of Medicine at the University of Pennsylvania. Annette Dekker, MD MS is an Assistant Professor of Emergency Medicine at the University of California, Los Angeles. They both have a direct professional interest in the public availability of immigration detention data because such data is essential to their research on the health consequences of immigration detention, including hospitalization, emergency care, morbidity, and mortality among detained and deported populations.

Nwadiuko and Dekker have relied on publicly available immigration enforcement and detention data in two principal ways. First, they use these data to identify and analyze patterns in serious medical events among people in immigration detention, including hospitalizations, emergency transfers, and deaths. Hospitalization records are particularly important because deaths in custody represent only the most severe and visible endpoint of a larger burden of medical emergencies, delayed care, and preventable morbidity. Access to hospitalization data allows researchers to examine where and when detained people require higher levels of care, how these events vary across facilities and contractors, and whether detention practices are associated with increased strain on surrounding health systems.

Second, they use these data to evaluate changes in detention-related health risks over time and across policy environments. Longitudinal access to hospitalization and related enforcement data allows them to assess whether medical events in detention are increasing, decreasing, or shifting across facilities, regions, and presidential administrations. These data are also necessary to distinguish isolated incidents from systematic patterns that may reflect broader problems in access to care, facility oversight, medical staffing, or detention conditions.

The continued availability of this data is essential to their work. In the most recent release, hospitalization records were no longer made available, substantially limiting researchers' ability

- 24 -

to study nonfatal but serious health events in immigration detention. Without access to reliable, timely hospitalization records and related enforcement data, Nwadiuko and Dekker cannot fully assess the health consequences of detention, identify facilities or systems where medical risks are concentrated, or produce the longitudinal analyses needed to inform courts, policymakers, oversight bodies, and the public. They therefore have a substantial professional and public interest in the relief sought by Plaintiff.

### *Paul Ong, Director, Center for Neighborhood Knowledge, UCLA Luskin School of Public Affairs*

Paul Ong, Ph.D., is a Professor at the UCLA Luskin School of Public Affairs and Director of the Center for Neighborhood Knowledge. He has a direct professional interest in the continued public availability of deportation and immigration enforcement data because such data is essential to the center's mission of providing timely, empirical analyses on critical events impacting communities, particularly disadvantaged populations.

The Center for Neighborhood Knowledge specializes in rapid-response quantitative research using multiple data sources, having previously produced analyses on the housing foreclosure crisis, the COVID-19 pandemic, and the L.A. wildfires. The center's current initiative focuses on ICE enforcement of immigration laws, producing research briefs that document the impacts of enforcement actions on Latino and Asian communities.[45] To conduct these studies, Professor Ong and his team rely heavily on the files made available through the Deportation Data Project. Without timely access to data from U.S. Immigration and Customs Enforcement, the center cannot produce the empirical research necessary to keep stakeholders informed and empower them to take appropriate action in response to enforcement activity affecting their communities.

The continued availability of this data is essential to Professor Ong's work. It would be impossible for the Center for Neighborhood Knowledge to carry out its current immigration enforcement research without the information provided through the Deportation Data Project.

---

[45] UCLA Center for Neighborhood Knowledge, Immigration Research, https://knowledge.luskin.ucla.edu/immigration-research.

BRIEF OF AMICI CURIAE ISO MOT. FOR PRELIM. INJUNCTION
CASE NO. 4:26-CV-03730-AMO

Professor Ong therefore has a substantial professional and public interest in the relief sought by Plaintiff.

### Dr. Nancy Plankey-Videla, Associate Professor of Sociology, Texas A&M University

Nancy Plankey-Videla, Ph.D., is an Associate Professor of Sociology at Texas A&M University. She has a direct professional interest in the public availability of deportation and immigration enforcement data because such data is essential to her academic research on immigrant trajectories, before and after deportation, and on how the enforcement of immigration policy shapes immigrants' lives in the United States.

Dr. Plankey-Videla's research examines how policy enforcement and particularly deportation affects immigrants' decision-making, including the choice to leave the United States voluntarily, a phenomenon sometimes referred to as "self-deportation." Her work further investigates what shapes deported or voluntarily departed immigrants' desire to remain in their country of origin or to return to the United States without authorization. Understanding these trajectories requires access to current, reliable deportation data that reveals the scale, patterns, and characteristics of enforcement actions over time.

The availability of this data is essential to Dr. Plankey-Videla's work. Without up-to-date deportation statistics, she cannot assess how evolving enforcement patterns influence the decisions and life courses of affected immigrants, nor can she produce the research necessary to inform public understanding of deportation's downstream consequences. Dr. Plankey-Videla therefore has a substantial professional and public interest in the relief sought by Plaintiff.

### Yael Schacher, Ph.D., Director for the Americas and Europe, Refugees International

Dr. Schacher and Refugees International use Deportation Data Project data to monitor the Trump administration's treatment of people applying for or in humanitarian statuses—asylum seekers and people who have won protection against removal—and specifically the pretermission of their cases in immigration court, pressure to take voluntary departure, their prolonged detention (and pressure to agree to self-deportation) and inadequate fear screenings, and cursory removal, including to third countries. The lack of adequate data and transparency about this targeted enforcement of vulnerable and protected populations by the Trump administration and the DDP's

insistence that the gaps be filled in— is crucial to our advocacy efforts related to access to asylum and prevention of refoulement.

### ***Professor Jayashri Srikantiah, Stanford Law School, Stanford, CA***

Jayashri Srikantiah is a Professor at Stanford Law School. She has a direct professional interest in the public availability of deportation and immigration enforcement data because such data is essential to her academic research on bias in agency decision-making, immigration detention, and the effect of legal representation.

Srikantiah has relied on publicly available enforcement data in multiple ways. Most recently, she and a co-author analyzed the data to write a white paper about Board of Immigration Appeals decision-making.

The continued availability of this data is essential to Srikantiah's work. Without access to reliable, timely enforcement statistics, she would be unable to conduct research. Srikantiah therefore has a substantial professional and public interest in the relief sought by Plaintiff.

### ***Stop AAPI Hate***

The DDP data has been a critical resource for Stop AAPI Hate. Stop AAPI Hate is a U.S.-based coalition dedicated to fighting racism and discrimination against Asian Americans and Pacific Islanders (AAPI). As the nation's largest reporting center tracking anti-AAPI hate acts, Stop AAPI Hate publishes data and research to paint a vivid and nuanced picture of racism and other forms of bigotry as it is experienced by our communities. Stop AAPI Hate has relied on DDP data for its coverage of ongoing ICE activity, including arrests, detentions, and deportations of people from Asian and Pacific Islander countries. Stop AAPI Hate used the datasets to develop and publish fact sheets that allows the public to understand how ICE activities from January 20, 2025 to March 10, 2026 affect Asian and Pacific Islander people. The coalition is also utilizing this data to develop an interactive data visualization tool to help AAPI communities understand trends by location and country of citizenship.

### ***Dr. Tara Watson, Ph.D., Director, Center for Economic Security and Opportunity, Senior Fellow, The John C. and Nancy D. Whitehead Chair, the Brookings Institution***

Tara Watson, Ph.D., is the Director of the Center for Economic Security and Opportunity,

BRIEF OF AMICI CURIAE ISO MOT. FOR PRELIM. INJUNCTION
CASE NO. 4:26-CV-03730-AMO

a Senior Fellow in Economic Studies, and the John C. and Nancy D. Whitehead Chair at the Brookings Institution. She has a direct professional interest in the continued public availability of deportation and immigration enforcement data because such data is integral to her research and policy analysis on the economic and social consequences of immigration enforcement in the United States.

Dr. Watson has relied on publicly available enforcement data in her published work and ongoing research. She used data on removals to produce a series on the macroeconomic implications of immigration policy, analyzing how enforcement activity affects labor markets, output, and growth at a national scale.[46] She is currently drafting a piece examining the diminishing availability of deportation data itself, documenting how previously routine government statistical updates are no longer being made available to the public.[47] Dr. Watson is also developing a data interactive using detainee records to estimate the number of U.S. citizen children affected by the detention of a parent, work that depends entirely on access to granular, individual-level enforcement data.

The continued availability of this data is essential to Dr. Watson's work. Regular and timely updates provide the transparency necessary to assess the current policy environment, particularly given the administration's general lack of transparency regarding immigration enforcement policies, practices, and statistics. Without access to this data, Dr. Watson and other researchers cannot independently evaluate official claims about immigration enforcement or inform policymakers and the public about its true scope and impact. Dr. Watson therefore has a substantial professional and public interest in the relief sought by Plaintiff.

---

[46] Tara Watson, *Macroeconomic Implications of Immigration Flows in 2025 and 2026: January 2026 Update*, Brookings Institution, https://www.brookings.edu/articles/macroeconomic-implications-of-immigration-flows-in-2025-and-2026-january-2026-update/.

[47] *See, e.g.*, Dep't of Homeland Sec., Off. of Homeland Sec. Statistics, *Monthly Tables*, https://ohss.dhs.gov/topics/immigration/immigration-enforcement/monthly-tables (previously providing regular enforcement data updates).